# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jose Lopez Orellana,

       Plaintiff,

    v.

Nobles County; Kent Wilkening, Nobles County
Sheriff, in his individual and official capacity;
John Doe, in their individual and official capacity;
and Richard Roe, in their individual and official
capacity,

       Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-3852 ADM/SER

---

Ian Bratlie, Esq., American Civil Liberties Union of Minnesota, Mankato, MN, on behalf of
Plaintiff.

Nathan Midolo, Esq., Iverson Reuvers Condon, Bloomington, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On November 17, 2016, the undersigned United States District Judge heard oral

argument on Plaintiff Jose Lopez Orellana's ("Orellana") Motion for Summary Judgment

[Docket No. 16], and Defendants Nobles County, Kent Wilkening, John Doe, and Richard Roe's

(collectively, "Defendants") Motion for Summary Judgment [Docket No. 22].  For the reasons

set forth below, Orellana's Motion is denied and the Defendants' Motion is granted in part and

denied in part.

## II. BACKGROUND

In November of 2014, Nobles County had a policy, practice, and custom of holding

individuals subject to an Immigrations and Customs Enforcement ("ICE") detainer after the time

the individual would otherwise be released from custody after arrest.

**A.  Orellana's Arrest**

On November 9, 2014, Orellana was arrested for driving under the influence.  Midolo Aff. [Docket No. 26] Ex. 1 ("Orellana Dep.") at 11:24–12:17; 15:19–24.  During the booking process at the Nobles County Jail, Orellana disclosed that he was not a lawful resident of the United States and that he was in the country illegally.  Id. 30:14–20.  ICE was notified and an immigration detainer, Form I-247, was issued.  Berkevich Aff. [Docket No. 25] Ex. 1.

The next day, Orellana appeared without an attorney for an arraignment and bail hearing before Minnesota State District Court Judge Jeffery L. Flynn.  Bail was set at $12,000 or, alternatively, $6,000 provided certain conditions, including electronic alcohol monitoring, were met.  Bratlie Decl. [Docket No. 19] Ex. 11 at 5:23–6:12.  In answering a question from Orellana about bail and electronic alcohol monitoring, Judge Flynn stated, "[h]owever, I am told that there is [an] immigration hold on this gentleman so I wouldn't give anybody any money because they're not going to let you go anyway."  Id. 7:6–9.

On November 18, 2014, Orellana, now represented by counsel, appeared before Minnesota State District Court Judge Gordon L. Moore, III, for a Rule 8 Hearing.[1]  Id. at Ex. 12. At the hearing, the bail set by Judge Flynn remained unchanged.  Id. 3:20–21.  Like Judge Flynn, Judge Moore referenced the ICE detainer and its impact on Orellana's release, stating, "[w]ell, it's somewhat academic because of the existence of the immigration detainer. . . .  Now, since there's an immigration detainer that apparently exists, you'd be well-advised to discuss with counsel . . . the situation you're facing before you post any bail because you won't be out of jail

---

[1] At a Rule 8 Hearing, the district court informs the defendant of the charges and certain rights, and arraigns the defendant.  See Minn. R. Crim. P. 8.01–8.02.

as long as there's a federal hold on you." Id. 3:19–4:4.  Orellana returned to jail after the hearing.

Later that same day, Orellana discussed bail on the phone with his wife, Maria Rosalina Flores De Lopez ("Flores").  Orellana Dep. at 21:4–10.  Orellana told Flores that Judge Moore said he only needed to pay $1,200 before he would be released.[2]  Id. 22:3–6.  On November 21, 2014, Flores and an interpreter went to the Prairie Justice Center intending to bail her husband out of jail.  Bratlie Decl. Ex. 2 ("Flores Dep.") at 11:9–12.  Flores approached a window inside the building and, through her interpreter, stated that she wanted to pay $1,200 to have Orellana released from jail.  Id. 13:10–11.  Flores recalls that three individuals behind the window told her "that [she] could not pay the money."  Id. at 15:6–7.

> Q.   And did they tell you that they were refusing to accept your money?
>
> A.   Well, they say no because [Orellana] still had another hearing, the last one.
>
> Q.   So you just said no.  So would they have accepted your money?
>
> A.   Well, I think they would, but they did not want it.
>
> Q.   So they were willing to accept the money, but your husband wouldn't have been released; is that what you're saying?
>
> A.   Well, no.  What they say is if they will accept the money, that would be a wasted money because they were not sure that immigration will come for my husband.
>
> . . .
>
> Q.   So they were telling you that if you gave them money, immigration would

---

[2] Orellana's attorney stated that, if allowed by the judge, a person's family may pay 10% of the bail amount to secure the inmate's release.  Bratlie Decl. Ex. 9.  Neither transcript of the November 10 or 18 hearings, however, reflect that Orellana was told by a judge of this possibility.

come pick him up and he couldn't appear for his next hearing?

A.     Yes.  And they say that at the end, those $1,200 would be wasted.

Q.     So they never refused to accept your money?

A.     No.

· · ·

Q.     If no one refused to take your money, why didn't you pay the money?

A.     Because they say that, the same thing.

Q.     What was the same thing?

A.     They say the same thing, that they could not accept the money.  I reached for money from my bag, and then I have the money in my hand, and they told me they cannot accept the money.

Q.     Was it your intention on November 2nd [sic] 2014 to bail your husband out of jail.

A.     Yes.

Id. at 15:22–16:11; 16:17–24; 26:17–27:3.  Flores then left the Prairie Justice Center.  Orellana remained in jail.

On December 1, 2014, Orellana appeared before Judge Moore and pled guilty to driving under the influence.  Midolo Aff. Ex. 7.  Orellana was sentenced to a stayed term of 360 days in jail, with credit for time served.  Berkevich Aff. Ex. 3.  He was then released from jail.

**B.  Orellana's Detainer**

Orellana's immigration detainer was issued by ICE on November 9, 2014.  Berkevich Aff. Ex. 1.  The detainer, ICE Form I-247, states that the Department of Homeland Security has "[d]etermined that there is reason to believe [Orellana] is an alien subject to removal from the United States."  Id.  The detainer requests that Nobles County

4

> [m]aintain custody of the subject for a period <u>NOT TO EXCEED 48 HOURS</u>,
> excluding Saturdays, Sundays, and holidays, beyond the time when the subject
> would have otherwise been released from your custody to allow [the Department of
> Homeland Security] to take custody of the subject.  This request derives from federal
> regulation 8 C.F.R. § 287.7.

<u>Id.</u> (emphasis in original).

## C. Nobles County's Detainer Policy in November 2014

The Nobles County Sheriff's office[3] is a member of Lexipol, a private company that provides law enforcement agencies policies that comport with state and federal guidelines and laws.  Midolo Aff. Ex. 6 at 20:13–16.  At the time Orellana was arrested, Nobles County had a policy of reporting arrestees to ICE if they were foreign born or suspected of being foreign born.  Berkevich Aff. Ex. 5 ("Policy C 505").  Policy C 505 states, however, "[i]n no event shall an inmate be held pending ICE verification only."  <u>Id.</u>  Consistent with Policy C 505, the Nobles County Sheriff's office would not hold an inmate ready to be released without some type of verification or request from ICE to hold that individual.  Midolo Aff. Ex. 6 at 40:10–20.

If ICE placed a hold on an arrestee, it had 48 hours to assume custody of that individual.  <u>Id.</u> 41:18–21.  This mirrored 8 C.F.R. § 287.7(d):

> Upon a determination by the Department to issue a detainer for an alien not
> otherwise detained by a criminal justice agency, such agency shall maintain custody
> of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and
> holidays in order to permit assumption of custody by the Department.

Nobles County Jail administrator, Monette Berkevich ("Berkevich"), testified that in November 2014, if ICE placed a detainer on an individual, the Nobles County Sheriff's office would hold that person for up to 48 hours beyond the time they were eligible for release.  Bratlie Decl. Ex. 4

---

[3] Throughout this Memorandum Opinion and Order, "Nobles County" and "Nobles County Sheriff's office" will be used interchangeably.

at 72:23–73:10.  Under this policy, a person subject to an ICE hold could remain in custody for up to five extra days, even if they were ready to be released on bail.[4]  If ICE did not pick up the individual within 48 hours, the inmate was released.  Id. 73:3–14.

## D.  Constitutional Concerns of ICE Detainers

In 2014, the constitutionality of detaining individuals on ICE holds was being litigated in federal courts across the country.  In May 2014, prior to Orellana's arrest, the American Civil Liberties Union ("ACLU") of Minnesota sent letters to all Minnesota sheriffs identifying constitutional concerns created by ICE detainers.  Bratlie Decl. Ex. 17.  Nobles County Sheriff Kent Wilkening ("Sheriff Wilkening") received, read, and shared the contents of the ACLU letter with Berkevich.  Id. Ex. 7 at 16:4–20.  The letter states that the detainer form has been amended to merely request, rather than command, a law enforcement agency to detain the individuals beyond the time they would otherwise be released.  Id.  The letter named Los Angeles, San Francisco, and Chicago as jurisdictions that had changed their practice to not automatically honor ICE detainers for an individual with only a minor criminal record.  Id.  Philadelphia and counties in Oregon were identified as not honoring any ICE detainers.  Id.

The letter explains that since federal law does not require honoring detainers, Nobles County must decide whether it will continue to honor the requests.  The ACLU advanced legal and policy justifications for urging Nobles County to join the growing number of law enforcement agencies across the country who have stopped honoring the detainers altogether. Id.

---

[4] If an individual ready for release on Friday was held over on a holiday weekend, they could remain in custody Saturday, Sunday, the Monday holiday, and Tuesday and Wednesday, the permitted 48 hours.

In June 2014, the Minnesota Sheriffs' Association sent an email updating Minnesota law enforcement agencies, including Nobles County, on the issue of ICE detainers.  Id. Ex. 19.  The email states that Hennepin County will no longer honor ICE detainer requests and, as the ACLU letter advises, that ICE holds are requests rather than mandatory commands.  Id.  Berkevich also testified receiving a forwarded email from Hennepin County Attorney Michael Freeman.  Id. Ex. 18.  The June 11, 2014 email announced Hennepin County's decision to no longer hold individuals after their state proceedings had been concluded on the basis of an ICE detainer:

> This issue has recently been litigate [sic] several times and several Federal Courts have ruled that these ICE detainer requests are voluntary on local officials and not mandatory.  Even ICE lawyers have backed down from their previous positions and now have acknowledged to us that these requests are just that, requests and are voluntary and no longer mandatory. . . .  A number of other jurisdictions have arrived at this same legal and policy conclusions such as New York, Washington D.C.[,] Miami, and, most recently, San Diego.

Id.

Also on June 11, 2014, Sheriff Wilkening received a memorandum of law from the Hennepin County Attorney's Office.  Bratlie Decl. Ex. 7 at 19:22–25; Ex. 20.  The memorandum stated that the legality of ICE detainers has shifted, citing several 2014 court decisions that held a detainer was a mere request rather than a mandatory requirement.  Id.

> There is no controlling precedent in the Eighth Circuit.  However, the recent federal court rulings and change in ICE policy lead to only one logical conclusion:  ICE detainers are requests rather than mandatory orders.  In other words, an ICE detainer or DHS Form I-247 without more is not legally sufficient to hold an individual in custody.  ICE detainers alleging that DHS has merely "determined there is reason to believe the individual is an alien subject to removal. . ." should no longer be relied upon by the [Hennepin County Sheriff's Office] to hold an individual in custody.

Id. Ex. 20.

Sheriff Wilkening and Berkevich discussed the contents of the emails.[5]  Id. Ex. 7 at 19:3–11; Id. Ex. 4 at 57:6–11.  Berkevich does not recall the details of their conversation but stated that she and Sheriff Wilkening decided to continue honoring ICE requests.  Id. Ex. 4 at 58:20–25.

Berkevich also testified receiving a November 20, 2014 memorandum from the Secretary for the Department of Homeland Security to the Acting Director of ICE.  Id. Ex. 21; Ex. 4 at 66:11–15.  The memorandum recognized "the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment."  Id. Ex. 21 (footnote omitted).  The Secretary directed

> ICE to replace requests for detention (i.e., requests that an agency hold an individual beyond the point at which they would otherwise be released) with requests for notification (i.e., requests that state or local law enforcement notify ICE of a pending release during the time that person is otherwise in custody under state or local authority).

Id. (emphases in original).

Berkevich testified that she and Sheriff Wilkening decided that the Nobles County Sheriff's office would honor the Department of Homeland Security's mission by continuing to honor ICE holds.  Id. Ex. 4 at 57:6–23.  Berkevich and Sheriff Wilkening reached this conclusion after discussing the above referenced materials and after communicating directly with ICE.  Id.  In making this decision, Berkevich testified that the Nobles County Sheriff's office recognized that even though ICE detainers were voluntary requests and not commands, the Nobles County Sheriff's office would continue to cooperate with ICE by honoring the detainers

---

[5] Wilkening does not recall if he shared the Hennepin County Attorney's Office's June 11 memorandum of law with Berkevich.  Bratlie Decl. Ex. 7 at 20:1–5.

it issued.  Id. Ex. 4 at 58:20–25.

**E.  Nobles County's Detainer Policy After July 2015**

In November 2014, Nobles County began changing its detainer policies as a result of ICE's shifting positions.  Id. at 31:2–5.  In July 2015, Nobles County modified its detainer policy.  Under the revised policy, unless an individual is charged with a federal crime or the detainer is accompanied by an independent showing of probable cause, "[n]o individual should be held solely on a federal immigration detainer under 8 C.F.R. § 287.7."  Berkevich Aff. Ex. 12.[6]

**F.  Orellana's Lawsuit**

Orellana's suit contends that he was denied the right to bail and was held for approximately 10 days on the basis of his immigration detainer, from November 21—when he should have been released on bail—to December 1, the date he was actually released.  Orellana alleges that his Fourth and Fourteenth Amendment rights were violated because he was detained solely because of the ICE detainer, which did not provide the Nobles County Sheriff probable cause to detain him beyond the time he would otherwise be released.  Orellana also asserts claims under the Minnesota Constitution and for common law false imprisonment.  The parties are both moving for summary judgment on all claims.

## III.  DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P.

---

[6] Orellana's demand for injunctive relief is mooted by Nobles County's change in policy.

56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the

evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A court considering a motion for summary

judgment must view the facts in the light most favorable to the nonmoving party and give that

party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving

party "may not rest upon allegations, but must produce probative evidence sufficient to

demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs.,

553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

## B.  Constitutional Claims

As an initial matter, Defendants argue that Orellana's constitutional claims against John

Doe, Richard Roe, and Sheriff Wilkening in his individual capacity are not actionable.  As to

John Doe and Richard Roe, Defendants argue that because allegations of unconstitutional acts by

municipal actors must be independently assessed, the failure to identify the actors who

committed the alleged constitutional violations warrants dismissal.  Individual capacity claims

against Sheriff Wilkening, Defendants continue, must also be dismissed because Orellana has

not alleged any facts showing that Sheriff Wilkening was present during Flores' November 21,

2014 effort to post bail or that he had any personal involvement in Orellana's continued

incarceration.

Orellana does not offer a response to these arguments, focusing instead on the viability of

his claims against Nobles County and Sheriff Wilkening in his official capacity.  The Eighth

Circuit has held that the failure to oppose a basis for summary judgment constitutes waiver of

that argument.  <u>Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.</u>, 558 F.3d 731, 735 (8th Cir.

2009).  Therefore, the Constitutional claims against John Doe, Richard Roe, and Sheriff

Wilkening in his individual capacity are dismissed.

The remaining Defendants subject to liability for any constitutional violations are Sheriff

Wilkening in his official capacity and Nobles County.  Since "[a] suit against a public official in

his official capacity is actually a suit against the entity for which the official is an agent," the

remaining claims turn on whether Nobles County caused the constitutional violations at issue.

<u>Parrish v. Ball</u>, 594 F.3d 993, 997 (8th Cir. 2010) (quoting <u>Elder-Keep v. Aksamit</u>, 460 F.3d 979,

986 (8th Cir. 2006)).

### 1.  Legal Standard

Orellana's constitutional claims are asserted under 42 U.S.C. § 1983.  <u>See e.g.</u>, <u>Henley v.</u>

<u>Brown</u>, 686 F.3d 634, 640 (8th Cir. 2012) (§ 1983 "serves as a vehicle for vindicating federal

rights elsewhere conferred by . . . the United States Constitution").  "Only state actors can be

held liable under § 1983."  <u>Carlson v. Roetzel & Andress</u>, 552 F.3d 648, 650 (8th Cir. 2008).

Municipalities, however, are "persons" subject to damages liability under 42 U.S.C. § 1983.

<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).  A municipality's liability under § 1983

rests on whether the constitutional violation was committed pursuant to an "official municipal

policy," an unofficial "custom," or a deliberately indifferent failure to train or supervise.

<u>Atkinson v. City of Mountain View, Mo.</u>, 709 F.3d 1201, 1214 (8th Cir. 2013) (quoting <u>Monell</u>,

436 U.S. at 690–91).

Orellana argues that his constitutional rights were violated in November 2014 because

the Nobles County Sheriff's office had a policy of holding individuals subject to ICE holds for

up to 48 hours even if bail had been posted.  Orellana claims that this policy was the "moving force [behind] the constitutional violation[s]."  Monell, 436 U.S. at 694.

The first step in the analysis is determining whether Orellana's constitutional rights were violated.  Orellana argues that his Fourth Amendment rights were violated when he was refused to be released on bail, resulting in a new arrest premised solely on an ICE detainer lacking in probable cause.  That same factual basis, Orellana argues, supports his Fourteenth Amendment Due Process claims.  Each will be addressed in turn.

### 2.  Fourth Amendment of the U.S. Constitution

Defendants dispute Orellana's contention that the ICE detainer was the reason he remained in custody after the time he was eligible to be released on the state charges. Defendants argue that it was Orellana's failure to pay bail and set up electronic alcohol monitoring that caused him to remain in jail.  Thus, there was no additional arrest that needed to be supported by probable cause independent from his driving offense.  Defendants further argue that even if Orellana can establish that his continued detention was because of the ICE detainer, his Fourth Amendment claim still fails because the detainer supplied probable cause to legally detain Orellana.

### a.  Bail Amount and Electronic Alcohol Monitoring

A threshold issue is whether the ICE detainer caused Orellana to be detained beyond the time he would have been released.[7]  Orellana argues that there is no factual dispute that he remained in jail because of the detainer.  Orellana insists that his wife was willing and ready to bail him out of jail but did not do so because Nobles County employees told her paying bail

---

[7] Orellana does not contest the legality of his arrest for his driving offense.

would not secure his release.  Defendants challenge this premise, arguing that the record

undisputedly shows that the proper bail amount was never tendered and that electronic alcohol

monitoring, a condition that was required upon Orellana's release, was never established.

According to Defendants, Orellana remained in custody not because of the ICE detainer but

because his bail conditions were not satisfied.

Defendants argue that Orellana's bail was set at $12,000 by Judge Flynn at the November

10, 2014 hearing, and was recited and left unchanged by Judge Moore at the November 18, 2014

Rule 8 hearing.  Because Flores presented only $1,200, Defendants argue that Orellena's bail

was never satisfied.  Defendants also argue that no arrangement were made for electronic alcohol

monitoring, a condition of Orellana's release.  Orellana, on the other hand, argues that he was

told that he only needed to pay 10% of his bail, or $1,200, to be released.  Orellana also argues

that electronic alcohol monitoring was not needed because Flores was tendering 10% of the bail

amount that secured his release without conditions.

The failure to satisfy release conditions has been viewed as dispositive in cases

challenging the legality of an ICE detainer.  In <u>Mercado v. Dallas County Texas</u>, No. 15-4008,

2016 WL 3166306, at *4 (N.D. Tex. June 7, 2016), certain plaintiffs' claims were dismissed

because those plaintiffs failed to allege that they "actually posted the bail that was set on the

charges pending against them (or, at the very least, attempted to post bail but were refused due to

the ICE detainer)."  Likewise, in <u>Nyenekor v. Doubois</u>, No. 07-5657, 2010 WL 21195, at *4

(S.D.N.Y. Jan. 5, 2010), claims were dismissed because the plaintiff "never made bail after the

detainer was filed, at no point was he prevented from obtaining his release because of an

immigration detainer."

In this case, there is a factual dispute as to whether Orellana's bail was properly tendered. Therefore, the factual uncertainty remains as to whether Orellana's continued detention was because of the ICE detainer or his failure to tender bail. Supporting Orellana's argument are the post hoc declaration of his attorney and his wife's testimony of her interaction with Nobles County employees inside of the Prairie Justice Center. However, the record does not show that either Judge Moore or Judge Flynn permitted Orellana to pay 10% of the $12,000 bail amount to be released. While Orellana argued at the hearing that a 10% cash deposit on a $12,000 bail setting was common practice in Nobles County, the silence in the record on this issue supports that Orellana's continued detention was the result of bail not being properly tendered. Flores' conversation to officials of the Prairie Justice Center is also less than clear, likely because Flores' words were translated from Spanish to English, and the employees' responses were then translated back to her from English to Spanish. Translation was also used in her deposition, which is the record testimony the Court must view on summary judgment. Even so, Orellana's argument has traction. Flores does not testify being told that $1,200 was not enough money or that certain conditions needed to be met before Orellana would be released. Rather, Flores was explicitly told not to pay because her "$1,200 would be wasted." Flores Dep. at 16:15–16 (emphasis added). The state of the record is too unclear to definitively resolve this factual dispute in Orellana's favor on summary judgment.

Finally, and significantly, when Orellana was sentenced for his driving offense, he was given credit for the 23 days he served in jail. Since Orellana would not have received credit for those 23 days if he had been released on bail on November 21, it is likely that he would have been sentenced to a period of imprisonment and returned to jail had Flores successfully secured

14

his release from jail.  Thus, Orellana's time in jail that he argues was an illegal detention—the ten day period between when Flores tried to pay bail and when Orellana was released—may not be an illegal detention but rather some (or all) of his term of imprisonment for driving under the influence.  The record is far from clear that his incarceration after Flores' attempt to post bail was solely because of the ICE detainer.

For these reasons, the parties' motions for summary judgment on Orellana's Fourth Amendment claim are both denied.  However, analysis of the merits of this claim will proceed because even if Orellana's detention was based solely on the ICE detainer as he argues, there is no Fourth Amendment violation if that detention was supported by probable cause, as Defendants argue.

### b.  Probable Cause

The question whether Orellana's continued confinement violated the Fourth Amendment turns on whether Defendants had probable cause to detain Orellana after he would have been released from detention on the state charges.  See Morales v. Chadbourne, 793 F.3d 208, 217 (1st Cir. 2015) (holding that detention pursuant to ICE detainer is an arrest under the Fourth Amendment that must be supported by probable cause).  Orellana's continued detention is properly viewed as a warrantless arrest, which "is reasonable under the Fourth Amendment where it is supported by probable cause."  Bernini v. City of St. Paul, 665 F.3d 997, 1003 (8th Cir. 2012).  Defendants argue that immigration detainers properly issued under 8 C.F.R. § 287.7(d) constitute the probable cause needed for law enforcement agencies to hold individuals beyond the time they would otherwise be released.  Orellana disagrees, arguing that his continued detention was premised on the ICE detainer and that his detainer, as issued, lacked the

probable cause needed to detain him within the confines of the Fourth Amendment.

Under the Fourth Amendment, "a fair and reliable determination of probable cause" must be provided "as a condition for any significant pretrial restraint of liberty." Baker v. McCollan, 443 U.S. 137, 142 (1979) (citation omitted).  The Supreme Court has held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).  Probable cause consists of "facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." Gerstein v. Pugh, 420 U.S. 103, 111–12 (1975) (quotation marks omitted).

Courts have ruled that detainers issued under 8 C.F.R. 287.7(d), the same regulation Orellana's detainer was derived from, do not categorically provide law enforcement a constitutionally permissible predicate for an arrest.  In Buquer v. City of Indianapolis, No. 11-708, 2013 WL 1332158, at *2, *8 (S.D. Ind. Mar. 28, 2013), a state law that expanded law enforcement's authority to, among other things, arrest an individual when an ICE detainer has been issued for that individual, was permanently enjoined.  Buquer determined that the law could not stand because it authorized arrests in circumstances much broader than when Congress permits authorities to make warrantless arrests under 8 U.S.C. § 1357(a)(2). Id. at *8.  In resisting the same result, Defendants cite Morales for the proposition that when ICE issues a detainer claiming to have "reason to believe" an individual is subject to removal, that form conveys to local law enforcement that probable cause exists to hold the individual under federal immigration laws.  In essence, Defendants argue that because "reason to believe" equates to

probable cause, and because Orellana's detainer states "there is reason to believe the individual is an alien subject to removal from the United States," Orellana's continued detention was lawful.  Defendants are correct that <u>Morales</u> lends support for their argument that "reason to believe" is equivalent to probable cause.  However, Defendants are incorrect that <u>Morales</u> provides authority that Orellana's continued detention was constitutionally permissible.

In <u>Morales</u>, the First Circuit noted that "[c]ourts have consistently held that the 'reason to believe' phrase in § 1357 must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause."  793 F.3d at 216 (quotation marks omitted).  The Eighth Circuit agrees.  <u>United States v. Quintana</u>, 623 F.3d 1237, 1239 (8th Cir. 2010).  But, contrary to Defendants' argument, having "reason to believe [that Orellana] is an alien subject to removal from the United States" does not, without more, provide the probable cause needed to make a lawful arrest.  Berkevich Aff. Ex. 1.  This is because, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States."  <u>Arizona v. United States</u>, 132 S. Ct. 2492, 2505 (2012).

Thus, in this case, because no warrant was issued for Orellana's arrest, Orellana's arrest and continued detention is lawful only if officers acted within their statutory authority for affecting a warrantless arrest.  Section 1357, discussed in <u>Morales</u>, is the statute that limits and bestows upon ICE the authority to make, among other things, warrantless arrests.  Relevant here is § 1357(a)(2), which authorizes a warrantless arrest of an alien if an immigration officer "has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."  Orellana's admission regarding his immigration status provided probable cause for the first half of what §

1357(a)(2) demands.  There is, however, no evidence that ICE or any other immigration officer

had probable cause to believe that Orellana was "likely to escape before a warrant can be

obtained for his arrest," the second half of what is needed before a warrantless arrest under §

1357(a)(2) is lawful.  See Arizona, 132 S. Ct. at 2506 ("If no federal warrant has been issued,

those officers . . . may arrest an alien for being 'in the United States in violation of any

[immigration] law or regulation,' for example, but only where the alien 'is likely to escape

before a warrant can be obtained.'"  (quoting § 1357(a)(2), alteration in original)).

This issue was directly addressed in Moreno v. Napolitano, No. 11-5452, 2016 WL

5720465, at *1 (N.D. Ill. Sept. 30, 2016), a suit brought by a class of individuals targeted by ICE

detainers.  In that case, plaintiffs were granted summary judgment on their claim that ICE's

practice of issuing detainers without obtaining an arrest warrant was prohibited by the

Immigration and Nationality Act.  Id. at *5.  In so ruling, Moreno held that the warrantless arrest

power of § 1357(a)(2) did not defeat their claim because "immigration officers make no

determination whatsoever that the subject of a detainer is likely to escape upon release before a

warrant can be obtained."  Id. at *8.  Moreno rejected ICE's claim that it did not need to make

any particularized determination of a suspected alien's likelihood to escape because "any

potentially removable alien who is in the custody of a local law enforcement agency is, by

definition, 'likely to escape before a warrant can be obtained' once he or she is released."  Id. at

* 6.

Defendants here are not arguing that an inquiry into an alien's likelihood of absconding

before a warrant can be obtained is unnecessary.  And neither ICE nor any employee of ICE is a

defendant in this action.  But Moreno confirms that for Orellana's detention under § 1357(a)(2)

to be lawful, the Fourth Amendment demands a particularized assessment of Orellana's

likelihood of escaping.  See Maryland v. Pringle, 540 U.S. 366, 371 (2003) (highlighting the

"particularized" inquiry probable cause demands).  No such inquiry was made here.  Rather, ICE

requested Defendants maintain custody of Orellana simply because it had "reason to believe

[Orellana] is an alien subject to removal."  Berkevich Aff. Ex. 1.  As demonstrated, this alone

does not provide a constitutionally sufficient basis to further detain Orellana beyond the time he

would have otherwise been released.  Without any showing that Orellana was likely to escape

before a warrant could be secured, the warrantless arrest made under § 1357(a)(2) violates the

Fourth Amendment.

### 3.  Fourteenth Amendment of the U.S. Constitution

Orellana also asserts both procedural and substantive due process claims under the

Fourteenth Amendment.  Defendants argue that these claims are duplicitous to Orellana's Fourth

Amendment claim and therefore they must be analyzed under the Fourth, rather than the

Fourteenth Amendment.

The Fourth Amendment covers only search and seizures, which Orellana asserts was

implicated when he was detained without probable cause.  "[I]f a constitutional claim is covered

by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must

be analyzed under the standard appropriate to that specific provision, not under the rubric of

substantive due process."  Cty. of Sacramento v. Lewis, 523 U.S. 833, 843 (quotation omitted).

Orellana's Fourteenth Amendment claims, Counts II, III, and IV, are covered by the

Fourth Amendment and the due process considerations therefore will not be separately analyzed.

Both Counts II and III allege a liberty deprivation based on the ICE detainer.  These claims are

fairly categorized as alleging an illegal seizure, which the Fourth Amendment protects against.
As to Count IV, it alleges a due process violation for Defendants' failure to accept bail.  This
claim is also fairly encompassed by the Fourth Amendment violation, since the liberty interest
allegedly violated by Defendants' refusal to accept bail was premised on the initial and
continued seizure that lacked probable cause.

### 4.  Minnesota Constitution

Defendants argue that dismissal of Orellana's claims arising under the Minnesota
Constitution is required because Minnesota law does not provide a direct cause of action for
damages for violating the state constitution.  Orellana's resistance to this result, that the
Remedies Clause in Article I § 8 provides a basis for a direct damages action, has been
persuasively and squarely rejected in Redd v. Abla-Reyes, No. 12-465, 2013 WL 6057860, at *1
(D. Minn. Nov. 15, 2013).  Summary judgment will be entered against Orellana on the state
constitution claims.

### 5.  Monell

A municipality or other government entity may be liable under § 1983 "if the
governmental body itself subjects a person to a deprivation of rights or causes a person to be
subjected to such deprivation."  Connick v. Thompson, 563 U.S. 51, 60 (2011) (quotation marks
omitted).  Since a municipality is not vicariously liable for the acts of its agents, plaintiffs
seeking liability against "local governments under § 1983 must prove that action pursuant to
official municipal policy caused their injury."  Id. (quotation marks omitted).  "Official
municipal policy includes the decisions of a government's lawmakers, the acts of its
policymaking officials, and practices so persistent and widespread as to practically have the

force of law." Id. at 61.

Orellana argues that Nobles County's official policy of continuing to detain individuals beyond when they are eligible for release solely because of an ICE detainer caused the constitutional violation in this case. Orellana's argument is well taken. Berkevich, testifying on behalf of Nobles County, stated that in November 2014, if a person subject to an ICE hold was incarcerated and bail had been set and paid, that person would not be released but would be held for up to 48 hours longer. It was Nobles County's adherence to this policy that resulted in Orellana being detained after he was eligible for release. As discussed above, this additional period of detention was made without probable cause, thereby exceeding the warrantless arrest power conferred by § 1357(a)(2).

## C. False Imprisonment

Orellana's final claim is for false imprisonment under Minnesota common law. Orellana argues that Defendants falsely imprisoned him when he was held beyond the time he should have been released on bail.

First, Orellana's false imprisonment claim against the unknown Doe and Roe Defendants cannot proceed past this point. Dismissal "is proper . . . when it appears that the true identity of the defendant cannot be learned through discovery or the court's intervention." Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985). Here, discovery has closed and Orellana has not come forward with facts to identify who these unknown defendants are. See Gold Star Taxi & Transp. Serv. v. Mall of Am. Co., 987 F. Supp. 741, 753 (D. Minn. 1997) (dismissing claims against unidentified John Does because "[e]ven after the completion of discovery, Plaintiffs have not ascertained the identity of or established any facts regarding these unnamed Defendants"). Thus,

summary judgment on the false imprisonment claim is granted as to the Doe and Roe defendants.

Second, summary judgment on this claim is also granted to Sheriff Wilkening in his individual capacity. Orellana does not allege that Sheriff Wilkening was the individual who either personally confined him or ordered others to hold him against his will.

Finally, summary judgment on the false imprisonment claim is denied for the municipal Defendants, Sheriff Wilkening in his official capacity and Nobles County. "Under the doctrine of statutory immunity, often referred to as discretionary immunity, municipalities are immune from liability for claims 'based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.'" Conlin v. City of Saint Paul, 605 N.W. 2d 396, 400 (Minn. 2000) (quoting Minn. Stat. §466.03, subd. 6 (1998)). Compared with Monell liability, where a municipality cannot be liable for the actions of others under a theory of respondeat superior, statutory immunity provides "an exception to the general rule that 'every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function.'" Id. (quoting Minn. Stat. § 466.02 (1998).

Statutory immunity only protects planning level governmental conduct, those decisions "involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." Id. In contrast, operational decisions, those that "relate to the day-to-day operation of government," are not protected as discretionary decisions. Steinke v. City of Andover, 525 N.W. 2d 173, 175 (Minn. 1994). In determining whether statutory immunity applies, "the underlying concern is whether the conduct at issue involves the balancing of public policy considerations in the formulation of policy."

Conlin, 605 N.W. 2d at 400

The conduct at issue here is detaining individuals pursuant to an ICE hold.  Berkevich generally described the process of implementing jail policies as collaborative—typically involving Sheriff Wilkening and the county attorney—and deliberate, made in consideration of staffing, pecuniary, and other concerns.  Specific to the ICE detainer policy, Berkevich testified that she and Sheriff Wilkening met and discussed the letters and emails they received concerning ICE detainers and whether Nobles County's policy should be amended as a result of the issues that were raised.  However, the record is not conclusive that Nobles County's ICE detainer policy falls within the ambit of a planning, rather than an operational, decision.  Berkevich's testimony on the public policy considerations critical to determining statutorily immunity was describing policy implementation generally, not the ICE detainer specifically.  Accordingly, her testimony does not provide the required particularity needed to insulate Nobles County from an actionable false imprisonment claim.

## IV.  CONCLUSION

Orellana was arrested and detained while immigration detainer policies were changing across the country and in Nobles County.  The record does not show any ill will by Nobles County or any of its employees, and the policy that may have resulted in Orellana's constitutional rights being violated was changed shortly after the events in this case.  But a jury could determine that Orellana was detained illegally for 10 days pursuant to an official Nobles County policy that was in effect at that time.  Before the case can proceed to trial, however, Orellana must produce evidence of damages.  As indicated above, it is possible that Orellana's sentence for his alcohol related driving offense would have required him to return to custody had

he been released on November 21, 2014.  His sentence of "time served" suggests the judge gave

Orellana credit for the additional days in custody that he would not have served if bail had been

tendered.  How many days he remained in detention because of the ICE detainer must be proven

at trial.  On this question, the record needs further development.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Plaintiff Jose Lopez Orellana's Motion for Summary Judgment

[Docket No. 16] is **DENIED**, and Defendants Nobles County; Kent Wilkening, Nobles County

Sheriff, in his individual and official capacity; John Doe, in their individual and official capacity;

and Richard Roe, in their individual and official capacity's Motion for Summary Judgment

[Docket No. 22] is **GRANTED IN PART and DENIED IN PART**:

1.  Summary Judgment is denied for Plaintiff and Defendant Nobles County and Sheriff Wilkening in his official capacity, and is granted for Defendants Kent Wilkening, Nobles County Sheriff, in his individual capacity; John Doe, in their individual and official capacity; and Richard Roe, in their individual and official capacity, on Count I, 42 U.S.C. § 1983 Fourth Amendment Illegal Search and Seizure;

2.  Summary Judgment is denied for Plaintiff and is granted for all Defendants on Counts II through VI; and

3.  Summary Judgment is denied for Plaintiff and Defendant Nobles County and Sheriff Wilkening in his official capacity, and is granted for Defendants Kent Wilkening, Nobles County Sheriff, in his individual capacity; John Doe, in their individual and official capacity; and Richard Roe, in their individual and official capacity, on Count VII, false imprisonment.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 6, 2017.